THE CHICAGO CITY RAILWAY COMPANY, Appellee, *vs.* THE SOUTH PARK COMMISSIONERS, Appellant.

*Opinion filed February 20, 1913—Rehearing denied April 2, 1913.*

1. MUNICIPAL CORPORATIONS—*extent to which jurisdiction of a park board over boulevard is exclusive.* So far as relates to the laying out, improvement and maintenance of parks, boulevards and driveways within a park district the jurisdiction of the park commissioners is exclusive; but that jurisdiction does not include the power of exclusive control of the intersections of public streets with boulevards and pleasure driveways.

2. SAME—*jurisdiction of city and park board over intersection of street with boulevard is concurrent.* The jurisdiction of a city and the park commissioners over the intersection of a public street with a boulevard is concurrent, in the sense that each has jurisdiction of the same territory; but the jurisdiction is for different purposes, that of the park board being for the improvement and maintenance of the intersection and that of the city being for the use of the intersection as a public street.

3. SAME—*city has sole power to authorize a street railroad in street crossing a boulevard.* The city has the sole power to authorize the construction of a street railway in a public street crossing boulevards or driveways under the jurisdiction of the park commissioners, but such commissioners, while they have no power to absolutely prohibit the construction of the street railway at the intersection of the street with the boulevard or driveway, have power

to impose such reasonable restrictions as will tend to preserve the use of the intersection for boulevard and driveway purposes.

4. SAME—*reasonableness of park board's restriction is for the court.*  Where a city has authorized the construction of a street railway in a public street which crosses a boulevard or pleasure driveway under the jurisdiction of a park board, and the street railway company will not agree to the restrictions imposed by the park board as to the method of construction, the question for the court, in a proceeding by the company to enjoin interference by the park board, is whether the restrictions are reasonable.

5. PARKS—*when park board has same jurisdiction over pleasure driveways as over boulevards acquired under act of 1879.*  Park commissioners have the same jurisdiction and control over pleasure driveways added to the park district prior to the act of 1879 as they have over boulevards or driveways acquired under such act.

APPEAL from the Superior Court of Cook county; the Hon. RICHARD E. BURKE, Judge, presiding.

ROBERT REDFIELD, (EDGAR B. TOLMAN, and HENRY P. CHANDLER, of counsel,) for appellant.

ZANE, BUSBY & WEBER, (LEONARD A. BUSBY, of counsel,) for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

The Chicago City Railway Company (hereafter called the company) was organized under an act of 1859, as amended by the act of 1865, with power and authority to construct, maintain and operate street railway lines within the then or future limits of the south and west divisions of the city of Chicago, upon such terms and conditions and with such rights and privileges as the city council might, by ordinance, authorize and prescribe. Under these acts and under ordinances adopted by the city council the said company has constructed a system of street railways covering the entire south division of the city. Prior to 1889 Hyde Park was an independent municipality, and Hyde Park avenue, extending from Fifty-fifth street to and beyond Sixty-third street, was one of its public streets. In 1889

Hyde Park was annexed to and became a part of the city of Chicago, and Hyde Park avenue is now Stony Island avenue, one of the public streets of the city. The company desired to extend its line from Fifty-fifth street south to Sixty-seventh street, there to connect with lines already built and in operation. One of the streets along which it was proposed to lay its tracks was Stony Island avenue from Fifty-sixth street to Sixty-seventh street. The company secured the necessary frontage consents, and upon petition to the city for authority to build said line the council adopted an ordinance July 5, 1910, authorizing the company to build, maintain and operate the extension of its street railway as requested, subject to the terms, conditions and limitations imposed by ordinance. Under an act passed in 1869 to provide for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake, a park district or system was created, consisting of what are now known as Jackson and Washington parks, a connecting strip between the two parks, called Midway Plaisance, and several strips, varying in width, for driveways or approaches to the park tracts and connecting with certain established boulevards. Under authority of an act passed in 1871, Fifty-seventh street from the east line of Stony Island avenue west to the Illinois Central railroad right of way was added to Jackson Park as a part of the park system. In building the proposed extension of the company's line from Fifty-fifth street to Sixty-seventh street, in Stony Island avenue, it was necessary, therefore, to cross Fifty-seventh street and Midway Plaisance, parts of the South Park system. The South Park Commissioners claimed exclusive jurisdiction and control over all park territory, including the intersections of Stony Island avenue with Fifty-seventh street and Midway Plaisance, and objected to the construction of the street railway across Fifty-seventh street and the Midway Plaisance except upon terms embraced in an ordinance adopted by the commissioners.

The company declined to accept the terms proposed, and the commissioners, as the bill alleges, forcibly prevented the building of the street railway line across the intersections over which they claimed jurisdiction.   Thereupon the company filed the bill in this case to enjoin the park commissioners from interfering with the construction, maintenance and operation of the street railway over the intersections in question.   The bill set up and relied upon the city ordinance as authority to build its line across said intersections, denied the jurisdiction of the park commissioners over them was exclusive, and alleged their jurisdiction was only for the purpose of improvement and maintenance as part of the boulevards, and alleged that all intersections for the purpose of public traffic were to be deemed public streets of the city of Chicago and subject to its jurisdiction. The bill alleged the ordinance adopted by the park commissioners defining the terms and conditions upon which the company might build and operate its street railway line across the intersections of Fifty-seventh street and Midway Plaisance was without warrant of law and void.   The answer, in substance, set up and relied upon the original and subsequent park acts as conferring exclusive jurisdiction upon the park commissioners over the disputed intersections, and averred that the ordinance of the city council of July 5, 1910, was ineffective as authority to the company to construct a street railway in any of the boulevards or parks comprised in the park system, and that so much of said ordinance as purported to authorize the construction of a street railway line on Stony Island avenue across Fifty-seventh street and Midway Plaisance is null and void, because the intersections are under the control of the South Park Commissioners as part of its park system.   The superior court entered a decree granting the relief prayed in the bill, and the park commissioners prayed an appeal. The trial court certified that the validity of a municipal ordinance is involved and that the public interest required

the appeal to be prosecuted direct to this court, which has accordingly been done.

While the park commissioners claim exclusive jurisdiction over the rectangular areas forming the intersections of Stony Island avenue with Fifty-seventh street and Midway Plaisance and that the company could not lay its street railway tracks in them without their consent, they did not absolutely refuse such consent, but on July 20, 1910, and while the work of extension was in progress, the commissioners passed an ordinance granting the company permission to lay its tracks and operate its street railway across said intersections upon certain terms, conditions and limitations provided in said ordinance. The bill alleges the company refused to accept the conditions because of the following provisions: "(*a*) That the company shall at its own expense pave from curb to curb, with such material and in such manner as the commissioners may direct, the portions of Fifty-seventh street and Midway Plaisance between the east and west curb lines of Stony Island avenue and the north and south lines of Fifty-seventh street and the Midway Plaisance, and thereafter maintain such pavement; (*b*) that the company shall at its own expense pave from curb to curb, with such material and in such manner as the commissioners may direct, all intersections of streets and any boulevard or street under the control of the commissioners where any tracks operated by the company shall cross such boulevard or street, and thereafter maintain such pavement in repair; (*c*) that the company shall at any time, upon the order of the commissioners, change or entirely remove its tracks, feed wires and conduits, and that in default thereof the commissioners may do so at the company's expense; (*d*) that should the commissioners at any time deem it necessary to construct a bridge or bridges across the Midway Plaisance, the company shall contribute and pay to the commissioners such portion of the cost as sixteen feet bears to the entire width; (*e*) that the com-

pany shall at its own expense maintain such number of flag-men at such points on Fifty-seventh street and the Midway at their intersection with Stony Island avenue, and on any other boulevard or street under the control of the commissioners where the company's tracks cross such boulevards, as may be directed by the commissioners; (*f*) that the permission and authority granted to the company shall be subject to such further and other restrictions as the commissioners may from time to time deem advisable; (*g*) that no work shall be done under the authority conferred by the ordinance until detailed plans shall have been presented to the commissioners and approved and a permit authorizing the same shall have been issued by the commissioners."

The bill also alleged that when the park commissioners stopped the work of laying the track appellee offered "and is now willing at its own expense to pave that part of Fifty-seventh street and the Midway Plaisance, at their intersections with Stony Island avenue, occupied by its tracks, for a distance of eight feet on each side of the center line between the tracks of the company lying between the north and south lines of Fifty-seventh street and between the south line of Fifty-ninth street and the north line of Sixtieth street, with the material and in the manner and to the lines and grades reasonably and properly directed by the commissioners, and thereafter to maintain said pavement in good condition and repair, safe for public travel; to replace the said pavement, from time to time, with such other pavement as the defendant may reasonably direct and maintain such new pavement in good condition and repair safe for public travel; to place all feed wires underground, in conduits laid to the lines and grades reasonably indicated by the commissioners; to furnish and erect trolley poles according to the reasonable specifications of the commissioners and to locate the same at reasonable places to be indicated by the commissioners. In case the commis-

sioners, for the purpose of improving Fifty-seventh street or the Midway Plaisance, should at any time desire the location of the tracks changed, the company is willing to re-lay and re-locate the tracks, trolley poles, wires and other apparatus in such reasonable places as the commissioners may direct, and to replace that part of the intersections occupied by its tracks in good order and condition, safe for public travel, within a reasonable time after the receipt of notice. In the event the commissioners shall modify its plan for the Midway Plaisance and shall deem it necessary to construct a bridge or bridges across the Midway Plaisance at Stony Island avenue, the company is willing to take up its tracks and operate its cars on temporary tracks until the completion of such bridge or bridges and then re-lay its tracks across such bridge or bridges, and to pave sixteen feet of the width thereof occupied by its tracks, and maintain said pavement in good condition and repair, safe for public travel. The company is willing to operate and propel its cars across Fifty-seventh street and the Midway Plaisance only by electric current generated at a distance and conveyed to the cars by trolley wires suspended from poles over the lines of said track, such wires to be not less than sixteen feet above the top of the rails and to be supported in such reasonable manner as the commissioners may direct; to cause all cars crossing Fifty-seventh street and Midway Plaisance, on the line of Stony Island avenue, to come to a full stop before entering on Fifty-seventh street or either drive of the Midway Plaisance, and to propel its cars across Fifty-seventh street and the Midway Plaisance at a rate of speed not exceeding four miles an hour; to make repairs to the pavement of said crossings in such a way and at such times as not to interfere unreasonably or unnecessarily with the public use thereof; to lay that portion of its tracks crossing the Midway Plaisance and Fifty-seventh street, on Stony Island avenue, with such type of rails as may be reasonably specified by the commission-

ers, and to indemnify and save harmless the commissioners from all losses, judgments, damages and expenses resulting from the operation of the company's tracks over the intersections of the Midway Plaisance and Fifty-seventh street with Stony Island avenue. The company will construct and operate its tracks over said intersections in such a manner that they will impose no additional financial burdens or expense upon the commissioners, and so that the safety, convenience and welfare of the public will not be unnecessarily or unreasonably interfered with." The bill alleged the park commissioners refused to consent to the construction of its line and operation of its street railway over the intersections named in the manner offered. The answer denied that the offer of the company was a full discharge of its obligations, and averred that on account of the exclusive jurisdiction of the park commissioners over the intersections the company had no right or power to determine for itself what terms and conditions should be in the grant of permission to lay its tracks across the intersections with Fifty-seventh street and Midway Plaisance.

The city is not a party to the suit, but the controversy involves the character and extent of its authority and that of the park commissioners over intersections of public streets of the city with streets and passageways known as boulevards and pleasure driveways under the control and management of the park commissioners as a part of the park system.

It is fundamental that the public streets of an incorporated city are under the control and management of the city and the power to authorize the construction and maintenance of a street railway in and upon them is in the city, but by the park acts jurisdiction is also given the park commissioners over boulevards and pleasure driveways which constitute part of the park system. The original act creating the board of South Park Commissioners was passed on February 24, 1869. Section 2 provided that the commis-

257 - 39

sioners should be a body politic and corporate and have and enjoy all the powers necessary for the purposes of the act. Section 4 provided for the selection by the commissioners of certain lands described, which, when acquired as provided by the act, were to be held, managed and controlled by the commissioners and their successors as a public park, subject to such necessary rules and regulations as the commissioners should from time to time adopt. Section 13 provided: "The said board shall have the full and exclusive power to govern, manage and direct said park; to lay out and regulate the same, * * * and, generally, in regard to said park they shall possess all the power and authority now by law conferred upon or possessed by the common council of the city of Chicago in respect to the public squares and places in said city, and it shall be lawful for them to commence the improvement of said park as soon as they have obtained one hundred acres of the premises herein described."

In 1879 an act was passed by the legislature authorizing park commissioners, with the consent of the corporate authorities having control of the street, and also the consent, in writing, of the owners of a majority of the frontage, to connect any public park, boulevard or driveway under their control with any part of an incorporated town, city or village, by selecting and taking any connecting street or streets, or parts thereof, leading to such park. Only such streets could be so taken as lay within the district, the property of which was taxable for the maintenance of such park. Some other conditions not necessary to be noted were added. Section 3 of said act is as follows: "Such park boards shall have the same power and control over the parts of streets taken under this act, as are or may be by law vested in them of and concerning the parks, boulevards or driveways under their control." (Laws of 1879, p. 216.) Under this act a number of streets of the city have been taken over by the park commissioners as boule-

vards and pleasure driveways forming approaches to the parks.

We have seen, Midway Plaisance and Fifty-seventh street did not become boulevards by virtue of the provisions of the act of 1879, but they are pleasure driveways, and we see no difference in the jurisdiction and control of the park commissioners over them and boulevards or driveways acquired under the act of 1879. Notwithstanding the broad and comprehensive language used in the park acts, we do not think it was intended by the legislature to take from the city all jurisdiction and authority over intersections of public streets with boulevards and driveways, nor was it the intention of the legislature to give the two municipal corporations the same or equal powers and authority over said intersections. The language of the acts under which the two corporate bodies are acting must be considered in connection with the purposes for which both were created. So far as relates to laying out, improving and maintaining parks, boulevards and driveways the jurisdiction of the park commissioners is exclusive, but that jurisdiction does not include the power of exclusive control of public street intersections with boulevards and driveways. The improvement of such intersections for boulevard and driveway purposes is vested in the park commissioners, but they are still parts of public streets and as such are under the control and jurisdiction of the city. Both have powers and neither can ignore or disregard the powers of the other. Their jurisdiction is concurrent but not co-equal. It is concurrent in the sense that each has authority and jurisdiction over the same territory, but such authority and jurisdiction are for wholly different purposes. While the park commissioners have exclusive jurisdiction for the improvement and maintenance of the intersections of public streets with boulevards and driveways for boulevard and pleasure driveway purposes, they have not the power either to prohibit or authorize the construction and operation of

a street railway over such intersections.   That power rests exclusively in the city.

The language used in *West Chicago Park Comrs.* v. *City of Chicago,* 152 Ill. 392, *McCormick* v. *South Park Comrs.* 150 id. 516, and some other cases, that the power and authority of park commissioners over boulevards and driveways are plenary and exclusive of the city of Chicago, referred to and was intended to define the powers of the city and the park commissioners with respect to the main- tenance and improvement of boulevards and pleasure drive- ways as such, and not as public streets of the city.   This is clearly indicated by the following language in the opin- ion in *West Chicago Park Comrs.* v. *City of Chicago, su- pra:* "We do not intend to intimate that in the exercise of other municipal powers and functions the city is excluded from jurisdiction over the park property, but only that, so far as relates to the laying out, improvement, management and control of the parks, the jurisdiction of the park board is exclusive.   For all the purposes, then, of laying out, im- proving and maintaining parks, boulevards, streets and like public grounds, the city and the park commissioners occupy the legal position of two independent and co-equal muni- cipalities, each vested with exclusive jurisdiction over the public grounds committed to its care, as trustee for the public."

Whether park commissioners had exclusive control over the rectangular areas constituting street intersections with a boulevard was directly raised and determined in *West Chi- cago Park Comrs.* v. *City of Chicago,* 170 Ill. 618.   There the park commissioners undertook to close certain streets crossing a boulevard.   The court said:   "The streets and boulevard must be regarded as intersecting streets, the for- mer under the control of the city and the latter under the jurisdiction of the park commissioners.   By the statute the most comprehensive powers are given to the city over the streets within its domain, and by the Park act the same

power and authority over the boulevard are vested in the park commissioners. Each corporation is of equal power and dignity within the limits assigned to it by the law, and each has an equal right within the areas covered by these intersections, which belong to both in common. It would be the height of absurdity to say that at each intersection of a street with a boulevard the powers of either cease at the line of intersection and begin again when the intersection is passed. It was unquestionably the design of the legislature that a boulevard, when laid out, should be a continuous driveway for pleasure and that the streets crossing it should be continuous highways. It could not be contemplated that either authority could cut off or close up the intersecting way without leave of the other. If the commissioners have the power to shut up these streets and compel the public to go around 250 feet north or 400 feet south over a new crossing, they have a right to shut them up absolutely. The principle is the same in either case, and the existence of such a power cannot be conceded. The jurisdiction, as we think, is concurrent, the commissioners having jurisdiction over the boulevard for all its uses and purposes, and the city having jurisdiction over the intersecting streets, subject to any limitations of use that may arise out of the park acts."

The above decision clearly distinguishes the character of the jurisdiction of the city and the park commissioners over street intersections with boulevards, and explicitly holds that while the park commissioners have jurisdiction over them for uses and purposes as a boulevard, the city has jurisdiction over them as streets. The city therefore had the power, and the sole power, to grant permission to the company to lay, operate and maintain a street railway across Fifty-seventh street and Midway Plaisance, and the ordinance passed in the exercise of that power was a valid ordinance. This power of the city could not, we think, be exercised without regard to and in a manner destructive

of the rights and powers of the park commissioners. The commissioners had no authority to absolutely prohibit the construction of the street railway authorized by the ordinance, but it did have a right to insist that the work should be done in such manner and subject to such reasonable conditions and limitations as would cause the least interference with the uses of the driveways for the purposes for which they were established and maintained by the commissioners. The city's control of intersections as parts of public streets did not include the power to disregard their uses and purposes as parts of the park system. It therefore became a proper question for determination by the court whether the terms imposed by the ordinance of the park commissioners were reasonable or unreasonable. It appears from the decree, however, that this was not the view of the chancellor. The decree is based upon the theory that the ordinance of July 5, 1910, authorized the construction, maintenance and operation of a street railway across Fifty-seventh street and Midway Plaisance upon the terms proposed by the company and that the park commissioners had no right or authority to interfere. We do not agree with that view. As we have said, the park commissioners could not absolutely prohibit building the street railway across the intersections, but they had a right to insist that it should be done with due regard to their power to maintain said intersections as parts of boulevards or driveways, and to that end it was their province to propose conditions. The conditions must necessarily be reasonable and with due regard to the rights of the commissioners and the company. The commissioners could not, by imposing unreasonable conditions, prevent the construction of the street railway and thereby do indirectly what they could not do directly. The commissioners and the company being unable to agree as to proper and reasonable conditions, it became the province of the court to determine whether the conditions sought to be imposed were reasonable or unreasonable. This, as ap-

pears from the decree, was not the basis of the decision, but it was based upon the theory that the park commissioners had no right to interfere with the construction of the street railway by imposing any conditions.

The decree is therefore reversed and the cause remanded to the superior court for further proceedings in harmony with the views herein expressed.

*Reversed and remanded.*